## Hylton v. Combs.

(Decided January 25, 1929.)

WOOTTON & WOOTON for appellant.

L. C. SLONE for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Reversing.

A dispute arose between James Arlie Combs and Jesse Hylton relative to the ownership of a small tract of land. Combs sued Hylton to recover for certain trespasses he alleged Hylton had committed on this land, to eject him therefrom, and to quiet the title of Combs thereto. He was successful, and Hylton has appealed.

In 1901, Sarah Johnson was the owner of a large tract of land which she wished to divide among her children and grandchildren. For this purpose she selected three of her friends and neighbors, and instructed them to go upon the land and make a division of it for her. They did so, and in that division tract No. 1 was allotted to Cordelia Combs, and tract No. 2, which adjoined No. 1, was allotted to Cindesta Hylton. Shortly after that division was made, Mrs. Johnson executed deeds conveying to these parties the land allotted to them in that partition. Subsequently, Mrs. Combs conveyed to James Arlie Combs the tract that had been allotted to her, and Mrs. Hylton divided among her children tract No. 2, and conveyed to Jesse Hylton that portion of the tract allotted to her which lay adjoining the tract that had been allotted to Mrs. Combs. The question out of which this litigation grew is the location of the boundary line between these two tracts. When these men made this partition for Mrs. Johnson, they first went around and all over the land, then afterwards went around each particular tract, and marked the boundaries thereof by marking the timber or by reference to natural objects. They made notes of what they had done, and from these notes the deeds were written. The particular part of these deeds which has occasioned this controversy is the location of a line from a birch, hornbeam, and service tree to a sycamore. There is no dispute between these parties about the location of these corners, but the question is: Is this a straight line from this birch corner to the sycamore, or does the line leading from the birch to the sycamore follow a curved course on which an old rail fence was standing at the time this survey was made, and which continued to stand on the same location for about 20 years thereafter? In the deed which Mrs. Johnson made to Mrs. Combs, she described this particular part of Mrs. Combs' boundary thus: ". . . Thence to a hornbeam and service and birch; thence down the creek to a sycamore opposite the beginning; thence crossing the creek to the beginning. . . . " The men who made this partition for Mrs. Johnson were introduced as witnesses, and all of them testified that at that time a stream known as Carr's fork passed near this birch corner and near the sycamore corner, but did not run in a straight line from the birch to the sycamore but made a curve to the west, and that the western bank of this creek was a high bank; there was then an old rail

fence on this bank, and all of them say that they located this line along this old rail fence, thus going around this curve from the birch to the sycamore, and not in a straight line from one to the other. They marked the timber along this curved line, and there is evidence that some of this timber is standing today, with the marks upon it.

In 9 C. J. 167, we find: "Where a line is described as running from one point to another it is presumed, unless a different line is described in the instrument, or marked on the ground, to be a straight line. . . . However, the legal presumption that a line running from one point to another is intended to be a straight line is overcome where a boundary line has actually been marked on the ground. This is in accordance with the well settled principle that lines actually run and marked on the ground control courses and distances. Furthermore, there may be accompanying words of description which will indicate the line is not intended to be a straight line." Numerous authorities are cited in support of that text, including authorities from this state. On page 211 of the same volume, practically the same thing is stated, and numerous authorities again cited in support of it including authorities from this state. Examining the description quoted above, it will be noted that the grantor describes this line as running down the creek to a sycamore and thence crossing the creek to the beginning. If this had been a straight line from the birch to the sycamore, of course it would have been downstream; but in going from the birch to the sycamore, the line would have crossed this stream twice, and then the last line from the sycamore to the beginning would have crossed it again. It seems rather strange, if this was to be a straight line, that no mention was made of the fact that it would be necessary to cross this stream twice in going from the birch to the sycamore, and yet the description should so carefully state in the last line that, in going from the sycamore to the beginning, it would be necessary to cross this creek. But going back again to 9 C. J. p. 168, we find this, with numerous authorities cited to support it, including authorities from this state: "Numerous well-considered cases support the doctrine that unless from the terms used in the description of a boundary line running up, down, or with a stream, the intent of the parties is clearly otherwise, such boundary line

will follow and be determined by the meanderings of the stream."

In the case of Carter v. Elk Coal Co. et al., 173 Ky. 378, 191 S. W. 294, Judge Carroll, writing for the court, collected and cited a number of cases in which expressions such as these, "running up the creek," "down the river," "running up Poor Fork," and "running down the river," were held to be calls for the meanders of the stream, and we are persuaded that the general presumption that the line from one point to another was intended to be a straight line is overcome in this case by the marked timber standing along the curved line, by the use of the expression, "down the creek," by the fact that the grantor speaks of the line crossing the creek after it gets to the sycamore and makes no mention of the fact that it would cross this creek twice before it got to the sycamore, if it were a straight line, by the conduct of the parties in allowing this old fence to remain where it was for about 20 years thereafter, and by the fact that Combs never undertook to build a fence along this straight line until the time this controversy arose, to which there is added the evidence of the three men who made the division, and all of whom said that this was a curved line, following the west bank of this old creek. It seems to us that this case is exactly like the case of Willoughby v. Willoughby, 48 S. W. 427, 20 Ky. Law Rep. 1061, wherein we held that even courses and distances would have to yield to the marked line where the courses and distances called for a straight line and the marked line called for a curved one. Carr's Fork has recently been straightened to a certain extent, and does not any longer flow where it did in 1901, when this division was made, and this change in the location of the creek, perhaps, contributed to this dispute; but that the location of the creek has been changed is overwhelmingly established by the evidence. Even the plaintiff himself admits that, and says that the new location of Carr's Fork is about 175 feet from the old one. The court ordered a survey made of the premises, and the surveyor, after notice to the parties, proceeded to make a survey, or rather two surveys. From this report is appears that this line following the curved course is thus described: Beginning on a birch and hornbeam stump, running thence with the old fence row N. 67 W. 38 feet to a rock; N. 46½ W. 68 feet to a white walnut stump; N. 44 W. 64 feet to another white walnut stump; N. 23 2/3 W. 97

feet to a post; N. 2½ W. 39 feet to a stake; N. 20½ E. 45 feet to a sycamore upon the bank of Carr's Fork.

To make this a straight line, the call would be: Beginning at a birch, hornbeam stump, thence N. 30 W. 315 feet to a sycamore on the bank of Carr's fork.

The trial court adopted the latter call, and held this to be a straight line; that Combs was the owner of the land in controversy, and gave Combs a judgment for $50 for the damages Hylton had caused. The trial court prepared a very elaborate opinion supporting that judgment, but we are convinced the court reached an erroneous conclusion, and that the judgment must be reversed. In lieu thereof, the court will enter a judgment adjudging this line to be as located in the first description given above, and dismissing the petition filed by Combs.

The judgment is reversed.